UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:11CV-00087-JHM

WAYNE NEAL BENNINGFIELD                                                      PLAINTIFF

V.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, ET AL.                                                    DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon cross-motions for summary judgment on the Administrative Record filed by Plaintiff, Wayne Benningfield [DN 14], and Defendants, Hartford Life and Accident Insurance Company, LG&E, and KU Energy LLC [DN 15]. Fully briefed, this matter is ripe for decision.

**I. BACKGROUND**

For almost 30 years, Plaintiff, Wayne Benningfield, was a Senior Equipment Mechanic for an electrical power plant formerly known as "Big Rivers," and now owned by LG&E and KU Energy. As a Senior Equipment Mechanic, he worked as a diesel mechanic and earned nearly $5,000.00 per month. Benningfield participated in the Group Long Term Disability Plan of E.ON U.S. LLC (the "Plan") issued by Defendant, Hartford Life and Accident Insurance Company, which is governed by § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

The Plan provides for payment of long-term disability ("LTD") benefits to qualified participants who meet the Plan's definition of "total disability." For the first three months of LTD benefits, the Plan requires that a participant be unable to perform the essential elements of his *own*

*occupation* to qualify as totally disabled under the Plan. (AR H1283.)[1]  After the Elimination Period and the first three months of LTD benefits, a participant must be "prevented from performing the Essential Duties of Any Occupation for which [he is] qualified by education, training, or experience" to be considered totally disabled under the Plan.  (Id.)  "Any Occupation" is defined under the Plan as an occupation:

> 1.  for which you are qualified by education, training or experience; and
> 2.  that has an earnings potential greater than an amount equal to the product of your Indexed Pre-disability Earnings and the Benefit Percentage.

(AR H1280.)

Benningfield became unable to work on June 6, 2009 due to a combination of impairments, including loss of function in his right shoulder and arm, impaired function in his left shoulder, and previous back injuries (including four lumbar spine surgeries, bulging discs and stenosis in his cervical spine).  MRI images taken in early 2009 revealed degenerative changes and a chronic rotator cuff in Benningfield's right shoulder and a distal tear and degenerative changes in the left shoulder.  Dr. Ryan Krupp, an orthopedic surgeon, advised Benningfield that both shoulders required surgery.  His left shoulder was operated on in June of 2009.  Partial replacement of Benningfield's right shoulder was performed in November of 2009.  Then, on November 30, 2009, Benningfield also experienced a sudden partial loss of vision, causing a permanent blind spot in his left eye.  Currently, Dr. Krupp has stated that Benningfield's right shoulder will never function normally and will require future surgery.

---

[1] The Plan provides that Total Disability or Totally Disabled means that: [D]uring the Elimination Period; and . . . for the next 3 month(s), you are prevented by . . . sickness . . . from performing the Essential Duties of Your Occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us." (AR H1283.)

Benningfield applied for and received LTD benefits from October 19, 2009 as he was determined to be unable to perform his *own occupation*. After the 90-day Elimination Period and the first three months of LTD benefits, Hartford approved Benningfield for continued LTD benefits finding that he was unable to perform *any occupation* for which he was qualified by education, training, or experience. On November 12, 2009, Benningfield received a letter from Defendant confirming that he met the policy definition of Total Disability. (AR H0025).

On August 31, 2010, however, Hartford terminated LTD benefits, finding that Benningfield was no longer disabled under the terms of the Plan. Hartford based the decision to terminate Benningfield's LTD benefits upon a statement from Plaintiff's treating orthopedist, Dr. Ryan Krupp. (AR H1084-H1085.) On August 4, 2010, Dr. Krupp stated that Benningfield had no restrictions with his left arm, and, with his right arm, he could lift/carry up to 20 pounds and reach frequently above his shoulder. (Id.) In analyzing whether Benningfield was disabled under the terms of the Plan, Hartford performed two Employability Analysis Reports ("EAR") using Benningfield's physical restrictions, wage requirements, and education, training or experience to determine if there were any occupations for which he was qualified. The second EAR identified five jobs that Benningfield was allegedly capable of performing. (AR H0737). Benningfield appealed Hartford's decision by letter dated April 26, 2011. With his appeal letter, Benningfield submitted additional medical evidence from his treating physicians, including his orthopedic surgeon, his ophthalmologist, and his primary care provider. (AR H0485). On July 1, 2011, Hartford denied Benningfield's appeal determining that:

> The combined medical information establishes that Mr. Benningfield is capable of performing full-time sedentary work. The 8/25/10 EAR identified four light occupations that are no longer relevant and one sedentary occupation that is still viable, Business Representative, Labor Union; this occupation is prevalent and

3

gainful for the claimant as he has held the position of Union Steward in the past.

(AR H012.) The one viable occupation led Hartford to determine that Benningfield was not prevented from performing any occupation, as that term in defined under the Plan. This suit followed.

## II. STANDARD OF REVIEW

The Court reviews Hartford's decision to terminate Benningfield's long-term disability benefits under "the highly deferential arbitrary and capricious standard of review" because Hartford has discretionary authority to interpret and apply the Plan. Killian v. Healthsource Provident Adm'rs, Inc., 152 F.3d 514, 520 (6th Cir. 1998) (quotation omitted). The arbitrary and capricious standard "is the least demanding form of judicial review. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Perry v. United Food and Commercial Workers Dist. Unions 405 and 442, 64 F.3d 238, 242 (6th Cir.1995). Put another way, a decision will be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Baker v. United Mine Workers of America Health and Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

Of course, while the arbitrary and capricious standard is deferential "it is not . . . without some teeth." McDonald v. Western–Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003) (quotation omitted). "[M]erely because [a court's] review must be deferential does not mean [its review] must also be inconsequential. . . . [T]he federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and

capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006) (citing McDonald, 347 F.3d at 172.).

To determine whether a plan administrator's decision to deny benefits was arbitrary and capricious, courts consider not just the medical evidence and opinions, but also whether there is a conflict of interest, whether the plan administrator failed to give consideration to the Social Security Administration's determination that the applicant was totally disabled, and whether the plan administrator based its decision to deny benefits on a file review instead of conducting a physical examination of the applicant. DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440 (6th Cir. 2009); Bennett v. Kemper Nat. Services, Inc., 514 F.3d 547 (6th Cir. 2008); Calvert v. Firstar Finance, Inc., 409 F.3d 286 (6th Cir. 2005). Such findings do not change the standard of review, but they do factor into the Court's analysis when determining whether the administrator's decision was arbitrary or capricious. Bennett, 514 F.3d at 552.

### III. DISCUSSION

Benningfield states that Hartford's decision to terminate his LTD benefits was arbitrary and capricious as he is still disabled under the Plan. Benningfield contends that his condition has not improved since Hartford originally awarded LTD benefits as evidenced by reports from Dr. Krupp, his orthopedic surgeon. Dr. Krupp stated that Benningfield will never return to normal function in his dominant right shoulder and that he has reached "maximum medical improvement." (AR H0324.) His shoulder injuries are also combined with several back ailments and a blind spot in his left field of vision. Specifically, Benningfield argues that Hartford's decision is arbitrary and capricious because of (1) the inherent conflict of interest; (2) Hartford required Benningfield to

5

apply for Social Security Disability but terminated his benefits while the SSD claim was pending without explaining the discrepancy between the decisions; (3) Hartford obtained and relied on a second EAR after the first one did not identify any occupations Benningfield could obtain; and (4) the only occupation Hartford claims Benningfield can obtain is one that he is not qualified for through his education, training or experience.

### A. Conflict of Interest

For purposes of ERISA claims, there is a conflict of interest where the insurance company is both the "decision-maker, determining which claims are covered, and also the payor of those claims." Calvert, 409 F.3d at 292 (citation omitted). In this case, Hartford is both the decision-maker and payor under the insurance policy. Accordingly, the Court will "view [Hartford's] explanation [for denying Benningfield's claim for benefits] with some skepticism" and will weigh this conflict as a factor in deciding whether Hartford's decision was arbitrary and capricious. Moon, 405 F.3d at 381–82.

### B. Social Security Benefits Decision

An award of disability benefits from the Social Security Administration ("SSA") does not automatically entitle a party to disability coverage under an insurance plan. Calvert, 409 F.3d at 294. However, the Sixth Circuit has explained that such a discrepancy is "far from meaningless." Id. A reviewing court should favor finding that an administrator's decision to deny benefits was arbitrary and capricious where an applicant is encouraged to apply for Social Security benefits, the plan administrator benefits from payouts by the SSA, and the administrator fails to adequately explain the discrepancy between the two decisions. Bennett, 514 F.3d at 554; Glenn v. MetLife, 461 F.3d 660, 669 (6th Cir. 2006).

In the present case, Hartford required Benningfield to apply for benefits with the SSA and, had the LTD benefits continued, Hartford's obligations to pay the benefits would have been offset by the amount of the SSA benefits. In fact, not only did Hartford require Benningfield to apply for SSA benefits, the Plan provided that "[i]f the Social Security Administration denies the appeals, benefits payable under this plan will terminate." (AR H1278.) However, Hartford determined that Benningfield no longer met the definition of Disability on August 31, 2010 and Benningfield was not awarded SSA benefits until December 20, 2010. Hartford argues that it was not obligated to wait for a decision from the SSA before determining that Benningfield was no longer disabled. Upon appeal though, Hartford did acknowledge that Benningfield was awarded SSA benefits. In its letter after Benningfield's appeal, affirming its decision to terminate, Hartford stated that it was not bound by the SSA's findings and that the two organizations apply different standards in making their disability determinations. (AR H0002.)

Benningfield argues that Hartford's decision to terminate his disability benefits was arbitrary and capricious because Hartford required Benningfield to apply for Social Security Disability ("SSD"), but terminated his benefits while the SSD claim was still pending. Benningfield reasons that Hartford did not wait for the SSA's decision because it was afraid that Benningfield would be approved and Hartford wanted to avoid having to explain the discrepancy.

The Court agrees that Hartford was not obligated to wait for the SSA to make a decision regarding Benningfield's LTD benefits. The Sixth Circuit has held "that a 'district court is strictly limited to the record of the administrator in its review,' and further held that a Social Security Administration decision issued sixth months after the insurer's decision could not be considered when determining if the insurer's decision [w]as arbitrary and capricious." Kouns v. Hartford Life

and Acc. Ins. Co., 780 F.Supp. 2d 578, 590 (N.D. Ohio, Jan. 19, 2011) (quoting Seiser v. UNUM Provident Corp., 135 Fed. Appx. 794, 799 (6th Cir. 2005)). Accordingly, the Administration's decision awarding benefits to Benningfield is not a relevant factor in determining whether Hartford was arbitrary and capricious in denying Benningfield's claim.

### C. The Decision to Terminate LTD Benefits

According to Hartford, the decision to terminate Benningfield's LTD benefits as of August 31, 2010 was based upon an assessment of Dr. Krupp, who stated that Benningfield could lift/carry up to 20 pounds with his right arm, lift/carry unrestricted with his left arm, reach above shoulder frequently with his right arm and unrestricted with his left. Dr. Krupp also noted that Benningfield could finger/handle and reach at waist level and below waist level with both arms without restriction. No restrictions on bending, kneeling./crouching or driving were noted.

In reviewing the claim, Hartford obtained two Employability Analysis Reports (EARs). The first EAR was obtained on June 1, 2010 from Roger K. McNeeley, a rehabilitation counselor, and found no viable occupations. (AR H1093.) After Dr. Krupp completed an Attending Physician's Statement of Continued Disability on August 4, 2010, Hartford requested Mr. McNeeley to conduct a second EAR. In the second EAR, Benningfield's functional capabilities were updated consistent with Dr. Krupp's current assessment. (AR H0735.) Based on the second EAR, five occupations were identified. However, in its July 1, 2011 letter denying Benningfield's appeal, Hartford acknowledged that only one of the five jobs was viable, Business Representative for a Labor Union. (AR H0002.) According to the EAR reports, a Business Representative for a Labor Union's job description is:

> Manage business affairs of labor union: Coordinates and directs such union functions
> as promoting local membership, placing union member on jobs, arranging local

8

>meetings, and maintaining relations between union and employers and press representatives. Visits work sites to ensure management and labor employees adhere to union contract specifications. May assist in developing plant production and safety and health measures. May negotiate with management on hours, wages, individual grievances, and other work-related matters affecting employees.

(AR H0744.) The job is listed under the "Managers, All Other" section of the code used by Mr. McNeeley and is estimated to pay $99,100.00 per year. (AR H0743.) Accordingly, Hartford determined that there was a viable occupation Benningfield could perform consistent with his education, training and experience, and his LTD benefits were terminated.

During his appeal, Hartford obtained opinions from two peer review physicians. Dr. Kimberly Cockerham, a nuero-ophthalmologist, agreed that Benningfield could not return to his previous job, but stated that he had a capacity for sedentary type work. (AR H0465.) Likewise, Dr. Andrew Williams, an orthopedic surgeon, after reviewing Benningfield's records and consulting with Benningfield's primary physician, determined that while Benningfield could not do repetitive, bending, twisting, or stooping and no overhead activities with either shoulder, he was able to perform light or sedentary work. (Id.)

After reviewing Dr. Krupp's updated Attending Physician's Statement, and opinions from two peer review physicians, Hartford determined that Benningfield was capable of performing light or sedentary work, even with the minimal limitations on his vision and right shoulder. Therefore, Hartford found that Benningfield was no longer disabled under the Plan.

### D. Arbitrary and Capricious

It seems there is support for the conclusion that Benningfield is capable of light or sedentary work. However, "[i]f physical ability to work were the sole calculus of disability, [the Court] could terminate [its] inquiry at this point." Biljan v. Aetna Life Insurance Company, 189 Fed. Appx. 423,

9

425 (6th Cir. 2006). Under Hartford's own Plan terms, a person is totally disabled if they can not perform the essential duties of any occupation, defining any occupation as an occupation: "1. for which you are qualified by education, training or experience; and 2. that has an earnings potential greater than an amount equal to the product of your Indexed Predisability Earnings and the Benefit Percentage."  (AR H1280.)  While Hartford is not required to provide Benningfield with a job, "it must consider whether the claimant is fit to work at a *reasonable* occupation after considering all relevant factors." Biljan, 189 Fed. Appx. at 426 (emphasis added). Benningfield's argument is that even if he is physically able to perform sedentary work, he still meets the definition of "total disability" under Hartford's Plan because he can not perform the essential duties of *any occupation* for which he is qualified by education, training or experience.

Under the "any occupation" standard, a plan administrator is "under a duty to make a reasonable inquiry into the types of skills [a claimant] possesses and whether those skills may be used at another job that can pay [him] the same salary range as [his pre-disability earnings]." McDonald, 347 F.3d at 162.  "Just as a plan administrator must consider some inquiry into the nature and transferability of a claimant's job skills, a plan administrator must make some inquiry into whether the jobs selected are ones that the claimant can reasonably perform in light of specific disabilities." Brooking v. Hartford Life and Accident Ins. Co., 167 Fed. Appx. 544, 549 (6th Cir. 2006). See also Fant v. Hartford Life and Accident Ins. Co., 2010 WL 3324974, *9 (E.D. Mich. Aug. 20, 2010).  Presumably, this is what Hartford attempted to do when it engaged Roger K. McNeeley, a rehabilitation counselor, to conduct the Employability Assessment Reports.

The first EAR showed no viable occupations.  The second EAR revealed only one. Benningfield argues that the one job Hartford found is not a viable occupation given his high school

education, 30 years of manual labor, and lack of supervisory and business skills to qualify him for this position. The Court agrees.

To begin with, the second Employability Assessment Report failed to take into consideration Plaintiff's partial loss of vision in his left eye. Hartford explained that, although Benningfield's ophthalmologist, Dr. Jones, stated that Benningfield could not return to his previous job, Dr. Jones never said that Benningfield would be unable to perform duties of a sedentary occupation. Even assuming Benningfield is capable of performing sedentary work with his partial loss of vision, this impairment should have been considered.

Next, changing Benningfield's abilities of compiling, computing, copying and comparing under the "Data" section of the Ability Profile in the second EAR, without any support that he was so capable is highly suspect. The second EAR stated it changed these abilities because LG&E's job description checklist for a Senior Equipment Mechanic included "preparing detailed record or reports such as inventory records, receiving reports, operating logs, lab analyses, quantities, etc.," which was listed as being performed 20-60% of work time. (AR H0736, H1255). This was a generalized mental requirement listed in a series of other general job functions as part of Benningfield's application for LTD. Benningfield's description of his own job did not include any compiling, computing and comparing of data though, only repairing mobile equipment with the use of sledge hammers, impact guns, large wrenches and pipe wrenches. (AR H1127.) The Court finds that Hartford's denial of Benningfield's long-term disability benefits based on an EAR that does not contain all relevant medical information, and includes abilities that neither Benningfield or his employer indicated he specifically possessed, suggests that Hartford did not perform a reasoned review of the claim. See Kouns, 780 F. Supp. 2d at 588 ("Although according to the occupation job

11

titles dictionary all of the potential jobs selected by Hartford for Kouns require low-level visual skills, the Court is troubled by the fact that Hartford based its final decision on an employability analysis that was never updated to include accurate medical information.")

Benningfield has a high school education and spent the last 30 years working as a diesel mechanic. He has no other training or experience. The EAR described a Senior Equipment Operator as a non-supervisory position, requiring use of "a sledge hammer, impact guns, large wrenches, pipe wrenches and [repairing] mobile equipment and conveyor belt systems." (AR H0735.) Nevertheless, the Employability Analysis Report concluded that Benningfield could obtain a professional and managerial position that requires managing business affairs, maintaining relations with unions, employers and press representatives, interpreting and enforcing detailed contract specifications, and negotiating with the management of companies. According to the EARs, the occupation of a Business Representative is categorized by the U.S. Department of Labor's Dictionary of Occupational Titles as an occupation in the "Professional and Kindred" industry. (AR H0742.) According to the dictionary, the Professional and Kindred industry occupations are defined as:

> [O]ccupations requiring extensive study or experience in professions, technical services, sciences, art, and related types of work. The preparation for these occupations . . . is typically acquired through university, college, and technical institute training; experience providing institute training; experience providing equivalent backgrounds; or some combination of these. The functions of these occupations are predominantly mental rather than manual.

(U.S. Dept. of Labor, Dictionary of Occupational Titles (4th Ed., Rev. 1991), available at http://www.oalj.dol.gov/ PUBLIC/DOT/ REFERENCES/DOTINDU.HTM.)

Hartford believes this occupation is viable because of Benningfield's experience as a union steward. Hartford is critical of Benningfield for arguing that his experience as union steward should

12

not be considered because it required no special qualifications, carried little responsibility, was based on seniority and no one else wanted to do it, because these facts are not in the record. That argument is well-taken, however, it points out another very important fact—that the record is devoid of any information related to what Benningfield's experience as a union steward actually was. There is no evidence that Mr. McNeely or Hartford ever knew what the experience entailed. Despite not knowing, Hartford concluded that Benningfield could go from diesel mechanic using sledge hammers and pipe wrenches to a business professional managing business affairs, interpreting and enforcing detailed contract specifications, and negotiating union matters with management. That is quite a leap, particularly when there is no evidence to show what Benningfield did as a union steward.

The question was never whether Benningfield was capable of sedentary work, but whether his training, education and experience would make him a candidate for an occupation that met certain earning requirements. After reviewing the relevant factors, weighing the inherent conflict of interest, and considering the one occupation identified, the Court finds that Hartford's decision did not result from a deliberate and principled reasoning process and was not supported by substantial evidence. Hartford acted arbitrarily and capriciously in terminating Benningfield's disability benefits and his benefits are reinstated.

### E. Other Benefits

In his Complaint, Benningfield brought suit against LG&E and KU Energy as well as Hartford, asking for reinstatement of all employee benefits in addition to LTD benefits. It appears that as an Eligible Disabled Employee, he will still qualify for medical and vision insurance under the Plan. Regardless, the claims against LG&E and KU Energy are not proper and they are

dismissed as parties.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Benningfield's motion for judgment on the administrative record [DN 14] is **GRANTED** and Hartford's motion for judgment affirming its decision [DN 15] is **DENIED**.  The Defendants, LG&E and KU Energy,  are dismissed from this action.

Joseph H. McKinley, Jr., Chief Judge
United States District Court

June 21, 2012

cc: counsel of record